In re **TERAZOSIN HYDROCHLORIDE ANTITRUST LITIGATION.**

No. 99–MDL–1317.

United States District Court, S.D. Florida, Southern Division.

July 2, 2001.

Order Granting Motion to Alter July 25, 2001.

will, therefore, be left for another day.

Mitchell Wayne Berger, Jeffrey Scott Wertman, Candice Diane Tobin, Berger Singerman, Las Olas Centre II, Fort Lauderdale, FL, Daniel L. Berger, David Sorensen, Eric L. Cramer, Berger & Montague, P.C., Philadelphia, PA, David Boies, Boies Schiller & Flexner, Armonk, NY, Joseph C. Kohn, Kohn, Swift & Graf, Philadelphia, PA, Jack Staph, Jack Staph & Associates, Pepper Pike, OH, Richard Drubel, Boies, Schiller & Flexner, Hanover, NH, Robert Scott Palmer, C. Oliver Burt, III, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, West Palm Beach, FL, Barry S. Taus, Bruce E. Gerstein, Stephen H. Schwartz, Garwin, Bronzaft, Gerstein & Fisher LLP, New York City, Aubrey B. Calvin, Mark S. Armstrong, Calvin Richardson Verner, Armstrong & Camp, Houston, TX, David P. Smith, Percy, Smith, Foote & Gadel, Alexandria, LA, John Gregory Odom, Stuart E. Des Roches, Randall Acree, Odom & Des Roches, New Orleans, LA, Scott Eliot Perwin, Kenny, Nachwalter, Seymour, Arnold, Critchlow & Spector, Miami, FL, Douglas E. Patton, Dewsnup, King & Olsen, Salt Lake City, UT, Bradley Joseph Gross, Barrett, Gravante, Carpinello & Stern, Fort Lauderdale, FL, Nicholas A. Gravante, Jr., Ryan Kees Higgins, Barrett, Gravante, Carpinello & Stern, New York City, Michael Straus, Straus & Boies, Birmingham, AL, Michael I. Endler, Barrett, Gravante, Carpinello & Stern, Albany, NY, Mary Boies, Boies & McInnes, Bedford, NY, for Valley Drug Company, Louisiana Wholesale, Drug Co., Inc., Walgreen Co., Inc., et al., Drug Mart Pharmacy Corp., plaintiffs.

Paul Alan Shelowitz, Akerman, Senterfitt & Eidson, Miami, FL, Robert Alexander Milne, Wayne A. Cross, Michelle Wilhelm, Paul Olszowka, Joseph Angland, Dewey Ballantine, New York City, Martha Jennet Talley, Dewey Ballantine, Washington, DC, Elizabeth J. Basten, Clark Hill, Detroit, MI, Jay Brian Shapiro, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, Miami, FL, Gerson A. Zweifach, Kevin M. Downey, Kirsten M. Schimpff, Kathleen L. Jennings, Manish K. Mital, Williams & Connolly, Washington, DC, Jon W. Zeder, Adorno & Zeder, Miami, FL, Kevin Clark Maclay, Jones, Day, Reavis & Pogue, Washington, DC, Stephen E. Morrissey, Jeffrey I. Weinberger, Stuart N. Senator, Munger, Tolles & Olson, Los Angeles, CA, Andrew J. McGuinness, Dykema Gossett, Ann Arbor, MI, for Geneva Pharmaceuticals, Inc., Ivax Pharmaceuticals, Inc., Abbott Laboratories, defendants.

## *ORDER GRANTING DEFENDANTS' MOTION TO DISMISS CERTAIN COUNTS OF THE INDIRECT PURCHASER PLAINTIFFS' COMPLAINT*

SEITZ, District Judge.

Defendants Abbott Laboratories ["Abbott"], Geneva Pharmaceuticals, Inc. ["Geneva"], and Zenith Goldline Pharmaceuticals, Inc. ["Zenith"] have moved to dismiss federal and state antitrust or unjust enrichment claims raised by "indirect purchasers"—individuals, corporations, and employee health plans that purchased prescription drugs containing terazosin hydrochloride after October 15, 1995, for consumption or redistribution instead of resale. (Defs.' Mot., Oct. 6, 2000 [D.E. No. 245].) Having carefully weighed the arguments presented by the parties, the Court will grant the defendants' motion in part and allow the indirect purchaser

plaintiffs, also known as "end payors," to file a third amended class action complaint.

## BACKGROUND

In Spring, 1998, Abbott entered into secret accords with generic drug makers Geneva and Zenith to forestall competition in its lucrative and exclusive domestic market for terazosin hydrochloride drugs. Abbott's drug, "Hytrin," was the only terazosin hydrochloride drug available in the United States for the treatment of hypertension or enlarged prostate until Geneva introduced its generic version of Hytrin on August 12, 1999. *See In re Terazosin Hydrochloride Antitrust Litig.*, Civ. No. 99–MDL–1317, slip. op. at 8–11, —— F.Supp.2d ——, —— – —— (S.D.Fla. Dec. 13, 2000) (recounting terms of agreements, which sought to preclude Geneva and Zenith from marketing the first generic terazosin hydrochloride drugs in the nation for some time, removed the risk that they would buy or sell the right to introduce such drugs in the interim, and enlisted them as allies who would oppose or at least ignore other companies' applications to produce such drugs).

Both the end payors and the "direct purchasers," who purchased terazosin hydrochloride drugs principally for resale, have filed class action complaints alleging that the defendants' clandestine accords violated federal and state antitrust or consumer protection statutes. On December 13, 2000, this Court granted the direct purchasers' motion for a partial summary judgment that these agreements were patently anti-competitive, unreasonable, and illegal *per se* under section one of the Sherman Antitrust Act, 15 U.S.C. § 1. *Id.* at 11–12, 18–19, —— – ——, —— – ——. Later in these proceedings, the direct purchasers will seek to prove that the defendants' illegal conduct actually injured them in "business or property" under section four of the Clayton Act, 15 U.S.C. § 15.

## DISCUSSION

The defendants' motion to dismiss essentially asks whether the end payors are legally entitled to the benefit of the Court's partial summary judgment decision in favor of the direct purchasers. As the defendants challenge the indirect purchasers' right to sue under both federal and state laws, the Court will address the parties' arguments in that order.

### 1. Standard Governing Dismissal for Failure to State a Claim

*Federal Rule of Civil Procedure* 12(b)(6) provides that dismissal of a claim is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir.1994) (citation omitted). The Court must accept the indirect purchasers' allegations as true and view those allegations in a favorable light to determine whether the complaint fails to state a claim for relief. *S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292, 1298 (11th Cir.2000).

### 2. The Indirect Purchasers' Federal Claims and *Illinois Brick*

Three federal claims appear in the end payors' second amended complaint ["complaint"]. Count One charges Abbott with "extend[ing] its monopoly power beyond the lawful boundaries of its patents," and Count Three charges all defendants with conspiring to "allow[ ] Abbott to maintain its monopoly," both "in violation of [s]ection [two] of the Sherman Act, 15 U.S.C. § 2." (Compl., Aug. 31, 2000, at 34, 39–40 [D.E. No. 227].) Count Five charges Abbott, Geneva, and Zenith with entering into contracts that were unreasonable restraints of trade under section one of the Sherman Act. (*Id.* at 42.) In all of these counts, the class plaintiffs allege

that "their injury consists of paying more for terazosin [hydrochloride] than they would have paid in the absence of [the antitrust] violation." (*Id.* at 34, 40, 42.)

Nearly twenty five years ago, in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the United States Supreme Court held that indirect purchasers of goods produced by firms engaged in price-fixing or other antitrust violations cannot pursue federal antitrust actions for damages against those firms. *Illinois Brick Co.,* 431 U.S. at 745–48, 97 S.Ct. 2061 (discussing section four of the Clayton Antitrust Act, 15 U.S.C. § 15(a)). Although this decision "denies recovery to those indirect purchasers who may have been actually injured by antitrust violations," it simplifies private enforcement and public adjudication of antitrust suits by "elevating direct purchasers to a preferred position," *id.* at 748, 97 S.Ct. 2061, and complements the U.S. Supreme Court's decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), which precluded defendants from challenging federal antitrust claims with evidence that direct purchasers "passed on" an illegal overcharge to their own customers. *Illinois Brick Co.,* 431 U.S. at 736–47, 97 S.Ct. 2061.

*Illinois Brick* blocks the end payors' federal claims. Although the end payors contend that they have suffered a unique injury in the form of "lost savings," (Pls.' Opp'n, Nov. 3, 2000, at 3 [D.E. No. 274] ), this locution does not disguise the fact that they are seeking damages for "paying more for terazosin [hydrochloride]." (Compl. at 34, 40, 42.) Like the direct purchasers, the end payors want to recoup an overcharge under federal law. The U.S. Supreme Court has flatly repudiated such efforts to trace damages through multiple levels in a chain of distribution or to apportion damages between direct and indirect purchasers. *Illinois Brick Co.,* 431 U.S. at 746, 97 S.Ct. 2061.

Contrary to the plaintiffs' suggestion, none of the exceptions to *Illinois Brick* apply here. The end payors' consolidated complaint does not demand injunctive relief or allege that the direct purchasers participated in the defendants' conspiracy. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *In re Beef Indus. Antitrust Litig.,* 600 F.2d 1148, 1168 (5th Cir.1979).[1]

Correspondence from the end payors' counsel indicates that, after oral argument, the indirect purchasers "have been persuaded to withdraw [the federal] claims." (Letter from Robert C. Gilbert, Esq., Liason Counsel, to the Honorable Patricia A. Seitz (Feb. 9, 2001).) For the preceding reasons, the Court will dismiss these claims with prejudice and turn to the end payors' other claims.

---

**1.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), the Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions that the former Court of Appeals for the Fifth Circuit rendered before October 1, 1981.

Additionally, the end payors lack standing to pursue their federal claims under the balancing test that the Supreme Court articulated in *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 534–47, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). As the phrase "indirect purchasers" connotes, there is an attenuated causal connection between the defendants' agreements and the end payors' alleged injury. Other entities, *i.e.,* the direct purchasers, may have sustained more direct injuries from the defendants' agreements. The indirect purchasers' complaint raises the spectre of an extremely complex apportionment of damages. Each of these concerns led the Supreme Court to conclude that the plaintiffs in *Associated General Contractors* lacked standing under the Clayton Act, *id.* at 545–46, 103 S.Ct. 897, and the same conclusion is appropriate with respect to the indirect purchaser plaintiffs in this case.

### 3. The Indirect Purchasers' State Law Claims

The four remaining counts in the end payors' complaint invoke state laws, and the first three of these counts parallel the end payors' federal claims. Count Two of the complaint charges Abbott with "extend[ing] its monopoly power beyond the lawful boundaries of its patents," Count Four charges all defendants with conspiring to "allow[ ] Abbott to maintain its monopoly," and Count Six charges the defendants with entering into contracts that were unreasonable restraints of trade, (Compl. at 35, 39, 43), all in violation of the laws of eighteen jurisdictions listed below.[2] Each of these counts repeats the allegation that the plaintiffs' injuries "consist[ ] of paying more for terazosin [hydrochloride] than they would have paid" absent the defendants' agreements. (*Id.* at 39, 41, 44.) Count Seven charges all defendants with unjust enrichment under the common law in most American jurisdictions. (*Id.* at 44–45.)

### A. Standing

■ Abbott, Geneva, and Zenith argue that the Court must dismiss most of the end payors' state antitrust claims for lack of standing. They complain that the named plaintiffs have not alleged personal injuries under many relevant state laws and have rested on allegations that unidentified class members have suffered injuries in the relevant states. (*See* Defs.' Mot. at 22.)

"[W]hen lack of standing is raised in a motion to dismiss, the issue is properly resolved by reference to the allegations of the complaint."[3] According to the indirect purchasers' complaint, the named plaintiffs suffered the same injury as other unidentified class members, mostly by "paying more" for Hytrin in Arkansas, California, Florida, Kansas, Michigan, Tennessee, Wisconsin, or Washington, D.C., and purchasing overpriced generic Hytrin in Arkansas, Florida, Michigan, and Wisconsin. (Compl. at 4–7.) None of the named plaintiffs allegedly resided or purchased Hytrin in Arizona, Maine, Minnesota, Mississippi, New Mexico, New Jersey, North Carolina, North Dakota, South Dakota, or West Virginia, and none of the named plaintiffs allegedly purchased generic Hytrin in California, Kansas, Tennessee, or the District of Columbia. (*See id.*; Defs.' Mot., at 22, 25 n. 15.)

Conceding that the end payors' allegations that they *personally* "pa[id] more for terazosin" in several states presents a "controversy" with adverse parties satisfying the constitutional prerequisites for standing,[4] the defendants ask the Court to

---

2. The jurisdictions and statutes cited are Arizona, California, Florida, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, New Jersey, New York, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia, Wisconsin, and the District of Columbia. (*Id.* at 35–39.) As the end payors have abandoned their New York claims, (Pls.' Opp'n at 28 n. 13), those claims in Counts Two, Four, and Six will be dismissed with prejudice.

3. *Church v. City of Huntsville,* 30 F.3d 1332, 1336 (11th Cir.1994). Abbott, Geneva, and Zenith did not move to dismiss the direct purchasers' complaint for lack of standing.

When Zenith later moved for summary judgment against the direct purchasers on standing grounds, the Court determined that it would permit the parties to complete discovery and deferred ruling on the issue, denying Zenith's motion without prejudice. *See* In re *Terazosin Hydrochloride Antitrust Litig.,* slip. op. at 8, —— n. 8 (drawing "no conclusion regarding whether the plaintiffs have suffered an antitrust injury").

4. (*See, e.g.,* Defs.' Mot. at 12 ("no named plaintiff has standing to pursue a claim under the laws of ten ... states").) *See generally* U.S. Const. art. 3, § 2; *Cone Corp. v. Florida*

enforce the prudential standing requirement that the plaintiffs assert just their "own legal rights and interests, not the rights of third parties." *Church v. City of Huntsville*, 30 F.3d 1332, 1335 (11th Cir. 1994) (citation and punctuation omitted); *see Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Abbott, Geneva, and Zenith point out that the named plaintiffs cannot "claim that they have suffered an invasion of legally protected interests under laws of states where they [did] not ... reside and did not purchase Hytrin." (Defs.' Mot. at 23.) In response, the named plaintiffs contend that they "can bring claims [under those laws] in a representative capacity without personally having standing to assert them." (Pls.' Opp'n at 14 (construing defendants' argument as "a challenge to the named [p]laintiffs' typicality or adequacy" under FED. R. CIV. P. 23).)

Controlling precedent does not endorse the plaintiffs' view. As the Court of Appeals for the Eleventh Circuit expressed in the case of *Griffin v. Dugger*, 823 F.2d 1476 (11th Cir.1987),

> it is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to just one of many claims he wishes to assert. Rather, *each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.*

823 F.2d at 1483 (emphasis added and citations omitted). Analyzing each of the end payors' state law claims separately, it is clear that no named plaintiff suffered an injury giving rise to an antitrust claim in Arizona, Maine, Minnesota, Mississippi, New Jersey, New Mexico, North Carolina, North Dakota, South Dakota, or West Virginia. (Compl. at 4–7, 35–41, 43–44); *see Dep't of Transp.*, 921 F.2d 1190, 1203 (11th Cir.1991).

ARIZ. REV. STAT. § 44–1402 (providing right of action against antitrust conspiracies affecting commerce "within this state"); ME. REV. STAT. ANN. tit. 10 § 1101 (same); MINN. STAT. § 325D.54 (same); N.J. STAT. ANN. § 56:9–3 (same); N.M. STAT. ANN. § 57–1–1 (same); N.C. GEN. STAT. § 75–1 (same); N.D. CENT. CODE §§ 51–08.1–01–02 (same); S.D. CODIFIED LAWS § 37–1–3.1 (same); W. VA. CODE § 47–18–3 (same); *see also* MISS. CODE § 75–21–21 (restricting venue for private antitrust suits to "the county where the trust and combine was formed, or where it exists or is carried on"). None of these statutes authorizes antitrust actions based on commerce in other states, and the named plaintiffs cannot rely on unidentified persons within those states to state a claim for relief. Class allegations that others suffered injuries giving rise to claims "add ... nothing to the question of standing." *Lewis v. Casey*, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *see Brown v. Sibley*, 650 F.2d 760, 771 (5th Cir. Unit A July 1981).

The end payors argue that *Andrews v. American Telephone & Telegraph Co.*, 95 F.3d 1014 (11th Cir.1996), compels a different result, but the *Andrews* decision does not stand for the proposition that nominal plaintiffs may bring dozens of state law claims in federal court "without personally having standing to assert them." (Pls.' Opp'n at 14.) In *Andrews*, the Court of Appeals rejected a *constitutional* standing challenge to a class action brought by four plaintiffs who alleged that the defendants violated "the laws of all of the fifty states." 95 F.3d at 1022 (citing evidence that named plaintiffs suffered "injury sufficient to create a 'case or controversy' under Article III"). It did not determine that the plaintiffs were entitled to assert other claims based on the rights of absent third

parties. The Court of Appeals simply concluded that the District Court abused its discretion in certifying classes based on "fifty sets of credit card and consumer protection laws." *Id.* at 1023–25. The *Andrews* decision frowned upon scatter-shot class actions; to the extent that it is relevant to the present case, it did not modify the law that "a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Griffin,* 823 F.2d at 1483; *see United States v. Hanna,* 153 F.3d 1286, 1288 (11th Cir.1998) ("In this circuit, only the court of appeals sitting *en banc,* an overriding United States Supreme Court decision, or a change in the statutory law can overrule a previous panel decision."). Counts Two, Four, and Six of the complaint will be dismissed without prejudice for lack of standing under the above-cited statutes.[5]

## B. The Long Shadow of *Illinois Brick*

While the U.S. Supreme Court has held that *Illinois Brick* does not preclude indirect purchasers from seeking damages for the violation of state antitrust laws, see *California v. ARC America Corp.,* 490 U.S. 93, 101–02, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989), many state legislatures and courts have adopted *Illinois Brick's* general prohibition against antitrust suits by indirect purchasers. *See, e.g., Stifflear v. Bristol–Myers Squibb Co.,* 931 P.2d 471,

475–76 (Colo.Ct.App.1996); *Vacco v. Microsoft Corp.,* 2000–2 Trade Cas. (CCH) ¶ 73,100, 2000 WL 1683386, at *2–3 (Conn.Super.Ct. Oct.10, 2000); *Abbott Labs., Inc. v. Segura,* 907 S.W.2d 503, 505–07 (Tex.1995); *Blewett v. Abbott Labs., Inc.,* 86 Wash.App. 782, 938 P.2d 842, 845–46 (1997). *But see Hyde v. Abbott Labs., Inc.,* 123 N.C.App. 572, 473 S.E.2d 680, 686 (1996) (holding that indirect purchasers may sue for redress of antitrust injuries); *Blake v. Abbott Labs., Inc.,* 1996–1 Trade Cas. (CCH) ¶ 71,369, 1996 WL 134947, at *5 (Tenn.Ct.App. Mar.27, 1996) (same). The *Illinois Brick* decision casts a long shadow across the indirect purchasers' state law claims.

Abbott, Geneva, and Zenith first contend that state case law related to *Illinois Brick* warrants the dismissal of the indirect purchasers' Arizona and New Jersey claims. Assuming *arguendo* that the end payors have standing to prosecute these claims, the Court will dismiss the Arizona action for failure to state a claim for relief and will defer judgment on the New Jersey claims.

### 1. Arizona

■ Counts Two, Four, and Six of the end payors' complaint invoke the Arizona Antitrust Act, which prohibits any "contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce ... within [the] state." ARIZ. REV. STAT. § 44–1402;

---

5. Whereas none of the named plaintiffs allegedly "paid more for [generic] terazosin" in California, Kansas, Tennessee, or the District of Columbia, see *supra* page 1370, the Court also will dismiss Counts Two, Four, and Six to the extent that they seek damages for overpriced generic terazosin hydrochloride under the laws of those jurisdictions. *See, e.g.,* D.C. CODE ANN. § 28–4501 (providing right of action against antitrust conspiracies restraining commerce "within the District of Columbia"); KAN. STAT. ANN. § 50–112 (prohibiting con-

tracts that "tend to prevent full and free competition in the importation, transportation or sale of articles imported into th[e] state, or in the product[ion], manufacture or sale of articles of domestic growth or ... domestic raw material"); TENN. CODE ANN. § 47–25–101 (same); *see also supra* note 4 and accompanying text (discussing standing requirements); *infra* pages 1377–1380 (reviewing Tennessee and California claims based on Hytrin purchases and concluding that end payors have further failed to state a claim under Tennessee law).

see also id. § 44–1408(B) ("A person threatened with injury or injured ... by a violation of this article may bring an action for appropriate ... equitable relief, damages sustained and ... taxable costs ...."). Since the Supreme Court of Arizona has not decided whether indirect purchasers may sue under this statute, this Court must sift through the precedents to determine how that tribunal most likely would rule in a similar case. See Putman v. Erie City Mfg. Co., 338 F.2d 911, 917 (5th Cir.1964).

It appears that the Arizona Supreme Court would adopt Illinois Brick and dismiss the indirect purchasers' Arizona claims for several reasons. First, the Arizona Antitrust Act urges that state courts "use as a guide interpretations given by the federal courts to comparable federal antitrust statutes," ARIZ. REV. STAT. § 44–1412, and the statute "generally follows the language of the Clayton Act." ARC America Corp., 490 U.S. at 98 n. 3, 109 S.Ct. 1661. Arizona's highest court has emphasized that federal antitrust decisions construing the Clayton and Sherman Acts carry significant weight. In All American School Supply Co. v. Slavens, 128 Ariz. 261, 625 P.2d 324 (1981), the Arizona Supreme Court declared that federal cases relied upon by the trial judge in ruling that the appellees did not violate the state Antitrust Act were "dispositive." 625 P.2d at 325. Illinois Brick is equally dispositive, for Arizona's legislature "clearly intended to strive for uniformity between federal and state antitrust laws" in enacting the state Antitrust Act. Wedgewood Inv. Corp. v. International Harvester Co., 126 Ariz. 157, 613 P.2d 620, 623 (App.1979).

Second, the Arizona Court of Appeals endorsed Illinois Brick's predecessor, Hanover Shoe, in rejecting an appellant's attempts to challenge a direct purchaser's antitrust claims with evidence that the appellee "passed on" an illegal overcharge. See Northern Ariz. Gas Serv., Inc. v. Petrolane Transp., Inc., 145 Ariz. 467, 702 P.2d 696, 704 (App.1984):

> The reasons for the almost universal disallowance of [this] defense are clear....
>
> The first rationale is that the ultimate customers either could not sue the wrongdoer, or as a practical matter would be unlikely to do so....
>
> The second ground for rejecting the defense is a practical one—the complexity of proof. Quantifying the costs passed on to consumers and separating them from the damage to the direct purchaser resulting from loss of volume or profits requires sophisticated analysis of market forces. Such projections are by their very nature speculative. [Hanover Shoe Co.,] 392 U.S. at 491–94 [88 S.Ct. 2224].

The rule against the "pass on" defense, first recognized in Hanover Shoe and embraced by the Arizona Court of Appeals in Petrolane, led to the Illinois Brick rule against suits by indirect purchasers seeking "passed on" overcharges. See Illinois Brick Co., 431 U.S. at 737, 97 S.Ct. 2061 (recognizing that indirect purchaser actions would "add whole new dimensions of complexity to treble damages suits and seriously undermine their effectiveness"). Although the end payors have found at least one unpublished trial court decision that rejects Illinois Brick,[6] the Court must

---

6. McLaughlin v. Abbott Laboratories, No. CV–95–0628, slip. op. (Ariz.Super. Ct. Yavapat Cty., July 9, 1996), cited by the end payors, is unpersuasive because it overlooks and contradicts the state Court of Appeals' statement that the Arizona legislature strove for "uniformity between federal and state antitrust laws"

in enacting the Antitrust Act. Wedgewood Inv. Corp., 613 P.2d at 623. Without citation to legislative history, McLaughlin assumes that the provision that judges "may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes," ARIZ.

follow appellate decisions such as *Petrolane* "absent some persuasive indication that the state's highest court would decide the issue otherwise." *Provau v. State Farm Mut. Auto. Ins. Co.,* 772 F.2d 817, 820 (11th Cir.1985) (citation omitted). The indirect purchasers' Arizona claims appear to be contrary to state law and will be dismissed with prejudice.

### 2. New Jersey

The end payors' complaint also relies upon the New Jersey Antitrust Act, N.J. STAT. ANN. §§ 56:9–1–19, (Compl. at 37), which "bars suits brought by indirect purchasers." *Kieffer v. Mylan Labs.,* 1999–2 Trade Cas. (CCH) ¶ 72,673, 1999 WL 1567726, at *3 (N.J.Super. Law Div. Sept. 9, 1999). As the end payors are entitled to show that their factual allegations would state a claim for relief under another statute, see *Brooks v. Blue Cross & Blue Shield,* 116 F.3d 1364, 1369 (11th Cir.1997), they have abandoned their antitrust claims and now argue that "the facts alleged ... constitute an 'unconscionable commercial practice'" under New Jersey's Consumer Fraud Act, N.J. STAT. ANN. §§ 56:8–1–13. (Pls.' Opp'n at 22.) The defendants maintain that the Supreme Court of New Jersey would follow *Illinois Brick* and dismiss Counts Two, Four, and Six to the extent that they rely on this statute. (Defs.' Reply, Dec. 5, 2000, at 17 [D.E. No. 286].)

New Jersey's Supreme Court has not decided whether antitrust or unfair competition allegations state a claim for relief under the Consumer Fraud Act, and there is a split in authority within the Superior Court on this issue. One trial judge has held that allegations of anti-competitive behavior cannot state a claim under a statute "enacted to help eradicate all forms of consumer fraud, not to deal with ... price fixing agreements and conspiracies to control supplies." *Kieffer,* 1999 WL 1567726, at *6; *see also id.* at *4–5 (citations omitted):

It is most significant that there is no case law construing the [Consumer Fraud Act] in a way that would include defendants' anticompetitive and monopolistic actions in the lexicon of unconscionable commercial practices.... [T]here is nothing inherently misleading or fraudulent in the defendants' acts of controlling the supply and overcharging for lorazepam and clorazepate. The defendants' attempt to control the supply and to charge excessive prices for the prescription drugs (conceded for purposes of the motion [to dismiss]), is typical anticompetitive conduct, for which a remedy is provided in the antitrust statutes.

.... The [Consumer Fraud Act] and the New Jersey Antitrust Act must be construed in such a way as to give effect to the provisions and intent of each statute.... [T]he New Jersey Legislature considered and rejected a proposed amendment to the Antitrust Act which would allow for indirect purchaser suits. If the court were to now read the New Jersey Consumer Fraud Act to allow for indirect purchaser suits, the Legislature's conscious decision to limit the scope of the New Jersey Antitrust Act to direct purchaser suits would be seri-

REV. STAT. § 44–1412, applies only to federal cases decided before 1974. *McLaughlin,* slip. op. at 2. The *Illinois Brick* rule hardly frustrates the Arizona Constitution's provision that "[m]onopolies and trusts shall never be allowed," ARIZ. CONST. art., 14 § 15, rather, it seeks to simplify private litigation against unlawful combines.

Additionally, the end payors report that another Arizona trial court rejected the *Illinois Brick* rule in *Friedman v. Microsoft Corp.,* No. CV–00–0722 (Super. Ct. Ariz. Maricopa Cty., Nov. 15, 2000), but they have not submitted a copy of that unpublished decision for review, and it is not presently available on electronic databases or the Superior Court's web site.

ously undermined.... [This interpretation] would abrogate the bar to indirect purchaser suits for such acts, and allow the proverbial "end run" to be made by the plaintiffs.

Since the *Kieffer* decision, however, another Superior Court judge has held that "the strong and sweeping ... remedial purpose" underlying the Consumer Fraud Act permits indirect purchasers to prosecute anti-competitive actions as unconscionable commercial practices under N.J. STAT. ANN. § 56:8–2. *See Cement Masons Local Union 699 v. Mylan Labs., Inc.*, No. MER–0431–99, slip. op. at 9–11 (N.J.Super. Law Div. Apr. 18, 2000).

The Court is inclined to follow the more thoroughly researched *Kieffer* decision and dismiss the end payors' New Jersey claims with prejudice, but it will reserve judgment pending the outcome of the appeal in that case, which has been fully briefed and argued before the Appellate Division of the New Jersey Superior Court. (*See* Defs.' Reply at 19 n. 8); *see also* In re *Microsoft Antitrust Litig.*, 127 F.Supp.2d 702, 723 (D.Md. Jan.12, 2001) (discussing status of *Kieffer* case).

## C. Interstate Conspiracies and Intrastate Conduct

Abbott, Geneva, and Zenith assert that the end payors' complaint fails to state a claim under the antitrust laws of Wisconsin or Tennessee because those laws typically apply only "to conduct that is predominantly intrastate in character." (Defs.' Reply at 21, 24.) Pointing to recent decisions construing these statutes, the indirect purchasers insist that they have stated claims for relief. (*See* Pls.' Supp., Dec. 1, 2000, at 4–5 [D.E. No. 284]; Pls.' Opp'n at 25–27.) The Court will uphold the indirect purchasers' Wisconsin claims and dismiss those based on Tennessee law.

### 1. Wisconsin

Counts Two, Four, and Six of the end payors' complaint allege that the defendants violated Wisconsin's chapter regulating trusts and monopolies, WIS. STAT. §§ 133.01–18, injuring plaintiffs such as Ewald Grosskrueger or United Wisconsin Services, Inc., a health care corporation. (Compl. at 5, 38–39, 40–41, 43–44.) Wisconsin's antitrust law provides that "[e]very contract ... or conspiracy, in restraint of trade or commerce is illegal." WIS. STAT. § 133.03. According to the defendants, the Wisconsin Supreme Court has long held that this provision governs anti-competitive conspiracies that affect intrastate (as opposed to interstate) commerce. (*See* Defs.' Mot. at 19 (citing *Grams v. Boss*, 97 Wis.2d 332, 294 N.W.2d 473, 480 (1980), and *Pulp Wood Co. v. Green Bay Paper & Fiber Co.*, 157 Wis. 604, 147 N.W. 1058, 1062 (1914)).) The end payors counter that a recent line of cases, led by *Emergency One v. Waterous Co.*, 23 F.Supp.2d 959, 970 (E.D.Wis.1998), has clarified that Wisconsin's antitrust chapter targets *all* anti-competitive conspiracies that adversely affect state commerce, regardless of whether the conspiracies are formed or implemented in Wisconsin. (*See* Pls.' Opp'n at 26.)

It appears that the Supreme Court of Wisconsin has not squarely resolved whether WIS. STAT. § 133.03 prohibits interstate conspiracies that allegedly restrained trade within the state. Nevertheless, Wisconsin's legislature has expressed its intent "to make competition the fundamental economic policy of th[e] state," WIS. STAT. § 133.01, and the most recent and comprehensive opinions endorse the end payors' more expansive view of the statute. As United States District Judge Adelman illustrated in *Emergency One*, most of the cases cited by the defendants "reflexively restate the intrastate/interstate distinction

as a mere preface to th[os]e courts' reliance on federal cases." 23 F.Supp.2d at 962, 966:

> The Wisconsin Supreme Court has for some time interpreted the state antitrust statutes to reach interstate activities in certain circumstances and has rejected a mutually exclusive vision of state/federal antitrust enforcement. Rote reliance on the "intrastate as distinguished from interstate," *Pulp Wood* to *Grams* line of precedent to dismiss state antitrust claims with any interstate aspect is therefore misplaced and inconsistent with Wisconsin precedent.

Wisconsin's antitrust chapter proscribes all "[u]nlawful activity which has significantly and adversely affected trade and economic competition within [the] state." *Id.* at 962; *cf. Wisconsin v. Milwaukee Braves, Inc.,* 31 Wis.2d 699, 144 N.W.2d 1, 12 (1966) (clarifying scope of chapter in observing that "[t]he state may ... enforc[e] its antitrust act against persons doing business in interstate commerce"). Recent cases from Wisconsin state courts also support the view that the statute prohibits entities from conspiring across state lines to restrain trade within Wisconsin. *See K–S Pharms., Inc. v. Abbott Labs.,* Civ. No. 94–2384, slip op. at 17–18 (Wis. Cir. Ct. Dane Cty. Sept. 5, 1995) ("limiting the scope of the statute to intrastate *commerce* do[es] not limit it to intrastate *conspiracies* .... it is not necessary for the complaint to allege acts of conspiracy in Wisconsin") (emphasis in original); *Carlson v. Abbott Labs.,* Civ. No. 94–2608, slip. op. at 2 (Wis. Cir. Ct. Milwaukee Cty. Mar. 23, 1995) (denying defendants' request to dismiss complaint alleging that interstate price-fixing conspiracy restrained trade in state infant formula market).

Applying these precepts and accepting the indirect purchasers' allegations as true, it is clear that the defendants' acts had a significant and adverse effect on commerce in Wisconsin, forcing consumers to pay artificially high prices for terazosin hydrochloride drugs. *See* In re *Cardizem CD Antitrust Litig.,* 105 F.Supp.2d 618, 665–66 (E.D.Mich.2000) [*"Cardizem I"*] (concluding that drug makers' alleged agreement to allocate United States market for brand-name drug Cardizem CD had a significant effect on price competition in Wisconsin); *K–S Pharmacies, Inc.,* slip op. at 17–18 (sustaining state claim based on effects of alleged nationwide conspiracy between drug makers and wholesalers); *Carlson,* slip. op. at 2. Therefore, the Court will deny the defendants' motion to dismiss the plaintiffs' Wisconsin claims.

### 2. Tennessee

■ Counts Two, Four, and Six of the end payors' complaint assert that the defendants violated the Tennessee Trade Practices Act ["TPA"], TENN. CODE ANN. §§ 47–25–101–112, injuring Mermel J. Valentine and others who "purchased Hytrin in Tennessee other than for resale." (Compl. at 6, 38, 40–41, 43–44.)[7] TPA prohibits "[a]ll arrangements ... which tend to lessen, full and free competition in the importation or sale of articles imported into th[e] state, ... and all arrangements ... which tend[ ] to advance, reduce, or control the price or the cost to the producer or the consumer of any such product." TENN. CODE ANN. § 47–25–102. The statute generally authorizes suits by indirect purchasers. *Blake,* 1996 WL 134947, at *3 (citing TENN. CODE ANN. § 47–25–106).[8] However, the parties dispute whether TPA reaches so far as to prohibit the nation-

---

7. As previously noted, Valentine lacks standing to assert claims pertaining to generic Hytrin. *See supra* note 5. Amending the complaint to correct this deficiency would be futile for the reasons discussed above.

8. Like Tennessee, West Virginia permits indirect purchaser actions. *See* W. VA. CODE ST. R. 142–9–1–2 ("[P]ersons who are indirectly injured by violations of the West Virginia Antitrust Act ... [may] maintain an action for damages."). The defendants' assertion that

wide conspiracy alleged in the end payors' complaint. Following the authority of *Standard Oil Co. v. Tennessee,* 117 Tenn. 618, 100 S.W. 705 (1907), and its progeny, the Court must answer in the negative and dismiss Valentine's claim with prejudice.

Ninety-four years ago, the Standard Oil Company ["Standard Oil"] opened its Tennessee storage facilities and disbursed imported oil free of charge to Evansville Oil Company clients to induce them to rescind orders placed with that company. *Id.,* 100 S.W. at 707–08, 712. Soon thereafter, Standard Oil and its agents were convicted of conspiring in Tennessee to destroy competition for the sale of coal oil within the state. *Standard Oil,* 100 S.W. at 705. On appeal, the Tennessee Supreme Court clarified TPA's scope and rebuffed the defendants' contention that the statute unconstitutionally infringed upon federal antitrust law or interstate commerce. Applying principles of statutory construction and legislative intent, the Court concluded that the statute applied to commerce within Tennessee, not contracts "in relation to the importation of articles." *Id.* at 711.

State appellate courts have refined the *Standard Oil* decision to hold that TPA "applies to transactions which are predominately intrastate in character." *Lynch Display Corp. v. National Souvenir Ctr., Inc.,* 640 S.W.2d 837, 840 (Tenn.Ct.App. 1982); *see Dzik & Dzik, P.C. v. Vision Serv. Plan,* 1989–1 Trade Cas. (CCH) ¶ 68,415, 1989 WL 3082, at *2 (Tenn.Ct. App. Jan.20, 1989). Although federal and state laws affecting commerce are no longer mutually exclusive, it is clear that the Tennessee legislature has not significantly broadened the scope of the statute. *See Ottinger v. EMI Music Distrib., Inc.,* Civ. No. 24885–II, Tr. at 132–33 (Tenn.Cir.Ct. Dec. 6, 2000) ("that's the last word in this state on this precise issue"). Hence, the defendants argue that they are immune to suit under TPA because "the conduct alleged in the complaint is predominantly interstate in character." (Defs.' Mot. at 18.)

Evaluating the complaint in the light most favorable to the indirect purchasers, the Court cannot reasonably infer that the defendants' transactions were "predominantly intrastate" in character and that the indirect purchasers have stated a claim under TPA. The complaint charges that the defendants misled a federal agency, instituted "sham" patent infringement suits in Illinois, New Jersey, and the District of Columbia, and entered into agreements to delay generic entry into a *nationwide* market for terazosin hydrochloride drugs. (Compl. at 20–27.) Conspicuously absent from the complaint are any allegations that the defendants forged alliances in Tennessee, stored terazosin hydrochloride drugs therein, or sold them within the state at the time. Indeed, the end payors' complaint is almost eerily silent on these points. Abbott, Geneva, and Zenith are headquartered in Illinois, Colorado, and Florida, respectively. (*Id.* at 7.) As previously noted, the named plaintiffs reside in ten different states and advance claims belonging to indirect purchasers across the nation. (*Id.* at 4–8.) The indirect purchasers allege that "[a]t all relevant times[,] the relevant geographic market is the United States." (*Id.* at 32.) [9]

West Virginia courts would follow *Illinois Brick* is incorrect.

9. Somewhat paradoxically, the end payors also argue that "all of the relevant transactions took place solely within Tennessee." (Pls.' Supp. Mem. at 3.) This argument is unavailing because the phrase "transactions" must refer to the actions taken by the defendants. *See* TENN. CODE ANN. § 47–25–102 (prohibiting "arrangements" to restrain competition); *Blake,* 1996 WL 134947, at *5 (reversing dismissal of vague TPA complaint, cautioning that "[i]f it is later determined ... that the actions complained of by the plaintiff

No reasonable observer confronted with these allegations would infer that the defendants' conspiracy was "predominantly intrastate" in character. Courts applying Tennessee law have repeatedly dismissed antitrust claims regarding conspiracies implemented across state lines even where there are concrete allegations regarding the defendants' conduct in Tennessee. Most recently, in the multi-district litigation case, *In re Vitamins Antitrust Litigation*, Misc. No. 99–197–TFH, slip. op. at 11 (D.D.C.2001), United States District Judge Hogan dismissed the indirect purchasers' claims because the defendants allegedly conspired to fix prices in the national market for vitamin supplements, and the allegation that one of the defendants implemented its pricing decisions through executives located in Tennessee was incidental to this nationwide conspiracy.[10] Similarly, in *Lynch Display Corp.*, the Tennessee Court of Appeals affirmed the dismissal of an antitrust challenge to lease and franchise agreements between Tennessee, Washington, D.C., and Maryland corporations because "goods, services, and payment ... [were] flowing between parties in different states." 640 S.W.2d at 840. One of the appellants had transacted business in Tennessee for seventeen years, but this intrastate activity was incidental to the alleged conspiracy. *Id.* at 841. Accepting the end payors'

allegations as true, the defendants' nationwide conspiracy was not predominantly intrastate in nature. The Court will dismiss Valentine's claims.

**D. Unfair Business Practices and Unjust Enrichment**

Lastly, the defendants dispute whether the indirect purchasers can sue Abbott for certain unfair business practices under California law or, for that matter, sue any defendant for unjust enrichment under the common law in most American jurisdictions. Although the Court will dismiss the end payors' California claims for lack of standing, see *supra* pages 1370–1372, the Court will examine both of these disputes on the assumption that the end payors may remedy this deficiency in a revised class action complaint.

**1. California**

■ Count Two of the end payors' complaint charges Abbott with singlehandedly or unilaterally monopolizing the market for terazosin hydrochloride drugs in violation of California's Cartwright Act, CAL. BUS. & PROF. CODE §§ 16700–61, by submitting false patent information to the Food and Drug Administration and pursuing baseless patent infringement suits against potential generic competitors, among other things. (Compl. at 35.) Both the Califor-

predominantly affect interstate commerce, then the defendants must prevail"); *Dzik & Dzik, P.C.*, 1989 WL 3082, at *2 (affirming dismissal of antitrust suit because Georgia company's decision to terminate contract with Tennessee firm was "incidental to the predominant agreement"); *Sherwood v. Microsoft Corp.*, 2000–2 Trade Cas. (CCH) ¶ 88,-797, 2000 WL 33200786, at *3–4 (Tenn.Cir. Ct. July 5, 2000) (declining to dismiss antitrust claims against defendant maintaining " 'massive' involvement ... in the Tennessee economy"). The undersigned judge is unwilling to predict that Tennessee appellate courts will broaden the scope of the state

antitrust statute. *But see Cardizem I*, 105 F.Supp.2d at 668.

**10.** *Id.* at 10–11; *see also FTC v. Mylan Labs., Inc.*, 99 F.Supp.2d 1, 8 (D.D.C.1999) (dismissing TPA claims that drug maker and its suppliers created "a price-fixing conspiracy that operated on a national level and affected at least 32 states" because such conduct "was predominantly interstate"); *Valley Prods. Co. v. Landmark*, 877 F.Supp. 1087, 1094 (W.D.Tenn.1994) (granting motion to dismiss complaint against nationwide franchise whose sales "necessarily implicate[d] many different geographic regions" and "only minimally affect[ed] intrastate commerce").

nia Court of Appeal and the United States Court of Appeals for the Ninth Circuit have held that the Cartwright Act does not proscribe unilateral conduct. *See Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1478 (9th Cir.1986); *Bondi v. Jewels by Edwar, Ltd.,* 267 Cal.App.2d 672, 73 Cal.Rptr. 494, 498 (1968) (noting that Cartwright Act prohibits agreements in restraint of trade). Conceding this point, the end payors have recast their allegations in Count Two as a claim for relief under California's Unfair Competition Law, CAL. BUS. & PROF. CODE §§ 17200–17210. (*See* Pls.' Opp'n at 27–28); *see also Brooks,* 116 F.3d at 1369 (recognizing that dismissal is unwarranted "if the allegations provide for relief on any possible theory"). The defendants insist that the Court must dismiss this claim because the Unfair Competition Law also does not apply to unilateral monopolization and its remedies are "generally limited to injunctive relief and restitution." (Defs.' Reply at 20 (citation omitted).) This Court does not concur.

California's Unfair Competition Law proscribes "unfair competition" in all of its forms, including "any unlawful, unfair or fraudulent business act or practice," CAL. BUS. & PROF. CODE § 17200. The state Supreme Court has repeatedly described this statute as "sweeping" in scope. *Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 83 Cal. Rptr.2d 548, 973 P.2d 527, 540–41 (1999); *Rubin v. Green,* 4 Cal.4th 1187, 17 Cal. Rptr.2d 828, 847 P.2d 1044, 1052 (1993); *Barquis v. Merchants Collection Ass'n,* 7 Cal.3d 94, 101 Cal.Rptr. 745, 496 P.2d 817, 829–30 (1972). This law "governs anticompetitive business practices as well as injuries to consumers," *Cel–Tech Communications, Inc.,* 83 Cal.Rptr.2d 548, 973 P.2d at 539, and the Court can find no

authority for the proposition that unilateral monopolization of the market for a prescription drug would not offend its provisions. The Unfair Competition Law does not authorize awards of damages at law, but the statute still provides a remedy because it explicitly provides that "[t]he court may make such orders or judgments ... as may be necessary to restore to any person in interest any money ... which may have been acquired by ... unfair competition." CAL. BUS. & PROF. CODE § 17203; *see also Cortez v. Purolator Air Filtration Prods. Co.,* 23 Cal.4th 163, 96 Cal.Rptr.2d 518, 999 P.2d 706, 712 (2000); *ABC Int'l Traders, Inc. v. Matsushita Elec. Corp.,* 14 Cal.4th 1247, 61 Cal. Rptr.2d 112, 931 P.2d 290, 304 (1997). Count Two of the end payors' complaint states a claim for relief under California law.

### 2. Unjust Enrichment: *Illinois Brick* Redux

■ Count Seven, the final count of the end payors' complaint, does not cite any federal or state statute. It simply alleges that the defendants were unjustly enriched by the voluntary acts alleged in the complaint and requests "a constructive trust consisting of all excessive amounts ... paid for terazosin [hydrochloride], from which [the end payors] ... may make claims on a *pro rata* basis for restitution." (Compl. at 45.) In their response to the defendants' motion to dismiss, the end payors attempt to clarify that Count Seven is not "based on federal common law," but "the common law of each state and the District of Columbia." (Pls. Opp'n at 28.) [11] Count Seven is very poorly pled.

Abbott, Geneva, and Zenith argue that the equitable state law claims in Count

---

**11.** The indirect purchasers appear to disclaim any cause of action under the laws of the United States Virgin Islands, American Sa-

moa, Guam, and the Commonwealths of Puerto Rico and the Northern Mariana Islands.

Seven must be dismissed unless the named plaintiffs first demonstrate that their claims are not barred by state rules against indirect purchaser actions similar to *Illinois Brick,* and then establish that they have standing to pursue these claims in the relevant jurisdictions. (*See* Defs.' Mot. at 27; Defs.' Reply at 26.) The end payors answer these familiar arguments by insisting that unjust enrichment "may be pleaded in the alternative" in all fifty states and the District of Columbia. (Pls.' Concl., Feb. 12, 2001, at 10 [D.E. No. 335] (citing *Cardizem I,* 105 F.Supp.2d at 669); Pls.' Opp'n at 31–32 (same).) The Court does not agree.

At the risk of repetition, indirect purchasers cannot recoup "passed on" overcharges under the *Illinois Brick* rule or its state progeny. *See supra* pages 1368–1369, 1372–1375. *Illinois Brick* expressed concerns that indirect purchasers actions would lead to complex apportionment disputes among injured parties, undermine the efficient enforcement of antitrust laws, or expose defendants to the risk of multiple liability. *See Illinois Brick Co.,* 431 U.S. at 726–32, 97 S.Ct. 2061. The end payors' unjust enrichment claim raises identical concerns. Both "the establishment of a constructive trust consisting of all excessive amounts ... paid for terazosin [hydrochloride]" and the adjudication of "claims on a *pro rata* basis for restitution" would require the Court to resolve unduly complex disputes and to impose a remedy reducing other plaintiffs' potential awards or subjecting the defendants to greater liability. State legislatures and courts that adopted the *Illinois Brick* rule against indirect purchaser antitrust suits did not intend to allow "an end run around

the policies allowing only direct purchasers to recover." [12]

The *Federal Rules* generally provide that "[r]elief in the alternative ... may be demanded," FED. R. CIV. P. 8(a), but they do not authorize end runs around state laws. Count Seven will be dismissed without prejudice to any unjust enrichment claim specifically pled under the common law of a jurisdiction that allows indirect purchasers to recover "passed on" overcharges. Presumably, the end payors will provide these particulars and spare themselves "the burdens of unnecessary pretrial and trial activity." *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys.,* 988 F.2d 1157, 1160 (Fed.Cir.1993).

## CONCLUSION

Even the favorable light emanating from *Federal Rule* 12(b) reveals distinct flaws in the indirect purchasers' complaint. Their allegations fail to state a clear or cognizable claim for relief under the federal antitrust laws and other state laws. The indirect purchasers have stated multiple claims for relief under the laws of several American jurisdictions, however, and they are entitled to the benefit of the Court's December 13, 2000, partial summary judgment decision to the extent that those jurisdictions follow federal court decisions interpreting the Sherman Act. For the reasons stated in the foregoing opinion, it is hereby

ORDERED that the Defendants' Motion to Dismiss [**D.E. No. 245**] is GRANTED in part and DENIED in all other respects, as indicated in Appendix A, and the indirect purchaser plaintiffs may file a Third

---

**12.** *Segura,* 907 S.W.2d at 506; *Kieffer,* 1999 WL 1567726, at *4–5 (voicing same concern under New Jersey law); *see also* Ivy Johnson, Note, *Restitution on Behalf of Indirect Purchasers: Opening the Backdoor to* Illinois Brick, 57 WASH. & LEE L. REV 1005, 1008–09 (2000). *But see Cardizem I,* 105 F.Supp.2d at 669 (concluding that plaintiffs could sue in equity because unjust enrichment claim required proof of different elements).

Amended Consolidated Class Action Complaint no later than **July 31, 2001**.

## APPENDIX A

| Counts and Claims DISMISSED with Prejudice | Counts and Claims DISMISSED without Prejudice | Remaining Counts and Claims |
|---|---|---|
| Count One: All claims. | Count One: N/A | Count One: N/A |
| Count Two: Arizona (brand and generic) New York (brand and generic) Tennessee (brand and generic) | Count Two: California (generic) District of Columbia (generic) Kansas (generic) Maine (brand and generic) Minnesota (brand and generic) Mississippi (brand and generic) New Jersey (brand and generic) * New Mexico (brand and generic) N. Carolina (brand and generic) N. Dakota (brand and generic) S. Dakota (brand and generic) W. Virginia (brand and generic)<br><br>* see page 12 | Count Two: Arkansas (brand and generic) California (brand) District of Columbia (brand) Florida (brand and generic) Kansas (brand) Michigan (brand and generic) Wisconsin (brand and generic) |
| Count Three: All claims. | Count Three: N/A | Count Three: N/A |
| Count Four: Arizona (brand and generic) New York (brand and generic) Tennessee (brand and generic) | Count Four: (See Count Two in this column) | Count Four: (See Count Two in this column) |
| Count Five: All claims. | Count Five: N/A | Count Five: N/A |
| Count Six: Arizona (brand and generic) New York (brand and generic) Tennessee (brand and generic) | Count Six: (See Count Two in this column) | Count Six: (See Count Two in this column) |
| Count Seven: N/A | Count Seven: All claims. | Count Seven: N/A |

***ORDER GRANTING INDIRECT PURCHASER PLAINTIFFS' MOTION TO ALTER OR AMEND THE COURT'S JULY 2, 2001 ORDER GRANTING DEFENDANTS' MOTION TO DISMISS CERTAIN COUNTS OF THE INDIRECT PURCHASER PLAINTIFFS' COMPLAINT***

THIS CAUSE came before the Court on Indirect Purchaser Plaintiffs' Motion to Alter or Amend the Court's July 2, 2001 Order Granting Defendants' Motion to Dismiss Certain Counts of the Indirect Purchaser Plaintiffs' Complaint. Having reviewed the motion and other pertinent portions of the record, and being otherwise fully advised in the premises, the Court hereby

ORDERS AND ADJUDGES that the Indirect Purchaser Plaintiffs' Motion to Alter or Amend the Court's July 2, 2001 Order Granting Defendants' Motion to Dismiss Certain Counts of the Indirect Purchaser Plaintiffs' Complaint is GRANTED as set forth herein. The July 2, 2001 Order is hereby modified to reflect that the Indirect Purchase Plaintiffs' claims under New York state law contained in Count IV and Count VI of Plain-

tiffs' Second Amended Consolidated Class Action Complaint are hereby reinstated, and reference to any Arkansas claims in Appendix A is deleted. In all other respects, the July 2, 2001 Order remains unchanged.